## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**MISTY HERNANDEZ f/k/a MISTY WHITE,**
Individually and on behalf of those
similarly situated*,*                                CASE NO.: 2:23-cv-3569

        **Plaintiff,**

**vs.**                                                **DEMAND FOR JURY TRIAL**

**NEWREZ LLC d/b/a**
**SHELLPOINT MORTGAGE SERVICING,**

        **Defendant.**
_____/

## CLASS ACTION COMPLAINT

Plaintiff, MISTY HERNANDEZ f/k/a MISTY WHITE ("White"), by and through her undersigned counsel bring this class action lawsuit for violations of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* ("RESPA"), its implementing regulation, Regulation X, 12 C.F.R § 1024 ("Regulation X"), the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA") and other violations of law, in accordance with the allegations set forth in the numbered paragraphs that follow.

## NATURE OF THE ACTION

1.      This is a putative class action brought under Rule 23 of the Federal Rules of Civil Procedure by Plaintiff White, on her own behalf and on behalf of all others similarly situated, against one of the country's largest loan servicers, NEWREZ, LLC d/b/a SHELLPOINT MORTGAGE SERVICES ("Defendant" or "NewRez"). NewRez, is employed by lenders to "service" mortgages on their behalf. NewRez, is the servicer of the mortgage loans which encumber Plaintiff's and Class Members' homes. As a servicer, NewRez regularly acts as a debt

collector.  This action is commenced to address NewRez's pattern and practice of failing to properly and timely process homeowner's mortgage payments, resulting in the assessment of prohibited or improper fees, as well as negligent or improper credit reporting regarding the mortgages that it services. NewRez's repeated failures have caused significant financial harm to a substantial number of homeowners in the proposed class.

2.     All conditions precedent to the filing of this action have been satisfied or waived.

## PARTIES JURISDICTION AND VENUE

3.     Plaintiff White is an individual citizen of the State of Texas, residing in Tarrant County.  At all times material, she owns and has occupied the property at issue, located at 2081 Parkridge Dr., Hurst, Texas 76054 (the "Subject Property").

4.     Plaintiff is a "consumer" as defined by 15 U.S.C. § 1681a(c) of the FCRA.

5.     Defendant, NewRez is a Delaware limited liability corporation with its principal place of business in Fort Washington, Pennsylvania.  At all times material, Defendant NewRez is and was a loan servicer as that term is defined in 12 U.S.C. § 2605(i)(2) and 12 C.F.R. § 1024.2(b). Moreover, NewRez services the loan obligation that's secured by a mortgage upon the Subject Property.

6.     At all times material hereto, Defendant NewRez is and was a loan servicer as that term is defined in 12 U.S.C. § 2605(i)(2) and 12 C.F.R. § 1024.2(b).

7.     The subject loan is a "federally related mortgage loan" as defined in 12 U.S.C. § 2602(1) and 12 C.F.R. § 1024.2(b) and referred to by Defendant NewRez as account number ******2962.  A copy of the applicable note and mortgage loan documents encumbering the Subject Property are attached as Exhibit A.

8.      At all times material hereto, Defendant NewRez is and was a "person" as defined by 15 U.S.C. § 1681a(b) of the FCRA which includes "any individual, partnership, corporation, trust…or other entity."

9.      At all times material hereto, Defendant NewRez is and was a "furnisher" according to 15 U.S.C. § 1681s-2, that regularly, and in the ordinary course of business, furnishes information to one or more of the credit reporting agencies ("CRA") pertaining to consumers, consumer transactions, ad/or experiences with consumers.

10.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises out of the RESPA and the FCRA federal statutes.

11.      This Court has general diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the Plaintiff and Defendant.  This Court also has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332(d). CAFA's requirements are satisfied in that (1) the members of the Class exceed 100; (2) the citizenship of at least one proposed Class member is different from that of the Defendant; and (3) the matter in controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000.00, exclusive of interest and costs.

12.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant NewRez resides within this District.

## LEGAL FRAMEWORK APPLICABLE TO THE CLAIMS
## RESPA AND REGULATION X STATUTORY STRUCTURE

13.      RESPA was enacted by Congress, in part, to ensure "that consumers throughout the nation are provided with greater and timelier information on the nature and costs of the settlement

process and are protected from unnecessarily high settlement charges caused by abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). Since "Congress intended RESPA to serve consumer-protection purposes[,] RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose. *See Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-666 (9th Cir. 2012) (citations omitted).

14.    As part of its consumer protection functions, RESPA permits a borrower, or an agent of a borrower, to submit a "qualified written request" ("QWR") to the servicer of the borrower's "federally related mortgage loan." 12 U.S.C. § 2605(e)(1)(B).  In sending a QWR to a servicer, a borrower can either request information from the servicer, or assert that the borrower's account is in error. 12 U.S.C. § 2605(e)(1)(B)(ii).

15.    RESPA provides that upon receipt of a QWR "a servicer of a federally related mortgage loan…shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A).

16.    Where a QWR requests a servicer to correct an error related to the servicing of a loan, RESPA provides that "not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request…the servicer shall…make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction" or, after conducting an investigation, "provide the borrower with a written explanation or clarification that includes…a statement of the reasons for which the servicer believes the account of the borrower is correct" either of which such notice "shall include the name and telephone number of

a representative of the servicer who can provide assistance to the borrower." 12 U.S.C. §§ 2605(e)(2)(A)-(B).

17.     Where a QWR requests information regarding a loan, RESPA provides that "not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request…the servicer shall…provide the borrower with a written explanation or clarification that includes" the "information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower." 12 U.S.C. § 2605(e)(2)(C).

18.     In 2010 RESPA was amended by Congress through the Dodd-Frank Wall Street Reform and Consumer Protection Act—Public Law No. 111-203, 124 Stat. 1376 (2010) to further clarify its application and to expand further obligations on servicers.

19.     As amended, it is a violation of RESPA for a servicer to "fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

20.     Moreover, RESPA, as amended, also requires servicers to respond to inquiries from borrowers seeking the identity and contact information of the owner or assignee of borrowers' mortgage loans within ten (10) business days. 12 U.S.C. § 2605(k)(1)(D).

21.     In addition to these amendments of RESPA, in January 2013, pursuant to the authority granted by the Dodd-Frank Wall Street Reform and Consumer Protection Act—Public Law No. 111-203, 124 Stat. 1376 (2010)—the Consumer Finance Protection Bureau ("CFPB")

issued a number of final rules concerning mortgage markets in the United States—known as "Regulation X" and codified as 12 C.F.R. § 1024.1, *et seq.* Regulation X became effective on January 10, 2014.

22.     Regulation X further expanded servicers' obligations under RESPA as it is unlawful, pursuant to RESPA, for a servicer to "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

23.     Through its enactment of Regulation X, the CFPB has provided guidance for the interpretation of certain RESPA provisions, including servicers' duties when responding to borrowers' QWRs. Regulation X also imposes requirements upon servicers in responding to two (2) new categories of correspondence from borrowers related to their mortgage loans; specifically, Requests for Information ("RFIs") and Notices of Error ("NOEs"). "While there is significant overlap between QWRs and [NOEs] and [RFIs], the terms are not synonymous. The CFPB has made this clear in its official interpretation of the regulations: 'A qualified written request is just one form that a written notice of error or information request may take. Thus, the error resolution and information request requirements in §§ 1024.35 and 1024.36 apply as set forth in those sections irrespective of whether the servicer receives a qualified written request.' 12 C.F.R. § 1024, Supp. I." *See Messina v. Green Tree Servicing, LLC*, 210 F.Supp.3d 992, 1007 (N.D. Ill. 2016).

24.     Relative to RFIs, Regulation X provides that "a servicer shall comply with the requirements of this section for any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account and states the information the borrower is requesting with respect to the borrower's mortgage loan." 12 C.F.R. § 1024.36(a).

25.     12 C.F.R. § 1024.36(d)(1) provides that a servicer must respond to an RFI by either "[p]roviding the borrower with the requested information and contact information, including a telephone number, for further assistance in writing" or "[c]onducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance."

26.     Importantly, unlike QWRs, RFIs do not need to relate directly to "servicing" to trigger the duties under Regulation X. The CFPB specifically addressed the "servicing" issue in its commentary on 12 C.F.R. § 1024.36(f): "While the final rule does not require that servicers undertake the information request procedures in § 1024.36(c) and (d) for oral submissions, *it does not limit information requests to those related to servicing*." 78 F.R. 10696, 10761 (emphasis added). Therefore, a servicer is required to respond to "any written request for information," and the scope of 12 C.F.R. § 1024.36(a) is not limited to "requests relating to servicing." *See Pollack v. Seterus, Inc.*, Civil Action No. 17-60475-Civ, 2017 U.S. Dist. LEXIS 202827, at *8-9 (S.D. Fla. Dec. 7, 2017); *St. Claire v. Ditech Fin. LLC*, No. 1:17-CV-03370-AT- JFK, 2018 U.S. Dist. LEXIS 219661, at *11 (N.D. Ga. Sept. 21, 2018).

27.     Relative to NOEs, Regulation X provides that "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred…A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for

purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request." 12 C.F.R. § 1024.35(a).

28.     12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to an NOE by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a phone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a phone number, for further assistance."

29.     Finally, RESPA and Regulation X impose requirements on servicers to respond to certain other inquiries from borrowers, even if those inquiries do not constitute QWRs, RFIs, or NOEs.

30.     For example, 12 C.F.R. § 1024.35(b)(6) permits a borrower to submit an NOE regarding a servicer's "failure to provide an accurate payoff balance amount upon a borrower's request," even though a request for a payoff balance is governed by 12 C.F.R. § 1026.36(c)(3), and not the provisions of Regulation X relating to RFIs and NOEs.

## FCRA STATUTORY STRUCTURE

31.     Congress enacted the FCRA to protect consumers from the harm caused from inaccurate reporting.   To this end, the FCRA imposes duties on persons who furnish information to a consumer reporting agency (a "furnisher").   *See* 15 U.S.C. §§ 1681s-2(a), (2), (4), (5). Specifically, the furnisher must take certain actions after receipt of notice of a consumer dispute

from a consumer reporting agency. 15 U.S.C. § 1681s-2(b)(1)(A-E).  The actions a furnisher must take after what is referred to as an "indirect dispute" include:

    a. Conducting an investigation with respect to the disputed information;

    b. Reviewing all relevant information provided by the consumer reporting agency pursuant to § 1681i(a)(2) of the FCRA;

    c. Reporting the results of the investigation to the consumer reporting agency;

    d. If an item of information finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and compile and maintain files on consumers on a nationwide basis; and

    e. If an item of information disputed by a consumer is found to be inaccurate or incomplete pursuant to a reinvestigation, promptly modify, delete, or permanently block the disputed information.

15 U.S.C. § 1681s-2(b)(1).

## STATEMENT OF FACTS

32.    NewRez is a mortgage loan servicer that regularly services mortgage loans in Texas, Pennsylvania and throughout the United States, including loans owned or assigned by Fannie Mae/Freddie Mac.

33.    The loan servicer's duties and obligations are clearly filled in and defined by the Fannie Mae or Freddie Mac written Seller/Servicer Guidelines (the "Guidelines") when the loan is either serviced by the lender itself or sold to third-party servicer entities.

34.    In this instance, the loans at issue affecting Plaintiff and the Class Members are serviced by NewRez; therefore, NewRez is required to comply with all servicing guidelines.

35.    NewRez is a mortgage "servicer" as that term is defined by 12 C.F.R. § 1024.2(b) and 12 U.S.C. § 2605(i)(2).  As stated above, NewRez is the current servicer of the notes and mortgages on real property that secure those notes, owned by Plaintiff and the Members of the Class.

36.     In its role as mortgage loan servicer, NewRez was responsible for preparation of items concerning the Note and Mortgage including, but not limited to, preparing and sending monthly statements, accounting for credit and debits on the Note, calculating, collecting, and disbursing escrow amounts, sending notices, responding to QWRs, NOEs and RFIs pursuant to RESPA and Regulation X.

37.     Additionally, as a mortgage servicer, NewRez has statutory and contractual obligations to collect and properly credit mortgage payments on behalf of homeowners.

38.     Specifically, Regulation Z of the Truth In Lending Act ("TILA") mandates that servicers promptly and properly credit and apply payments made by homeowners to their mortgage accounts.  *See* 12 C.F.R. § 1026.36(c)(1).  RESPA finds it a covered error, actionable if not corrected, for a servicer to fail to timely credit a borrower's payment on the date of receipt in violation of Regulation Z.  *See* 12 C.F.R. § 1024.35.  Any improper fees, including late fees which are assessed against the borrower's account for the servicer's error in applying payments are also actionable pursuant to RESPA.

39.     Moreover, late fees and their assessment are governed by the Note encumbering the borrower's property.  According to the Fannie Mae/Freddie Mac Uniform Multistate Fixed Rate Note, which governed Plaintiff's property, a payment is late on the 16th day if the full monthly payment of principal and interest are not received.  Furthermore, a servicer is required to apply payments in the order of interest, principal, escrow amounts, then any fees.  Therefore, late fee could not be assessed if an amount received covered the principal and interest due.

## NewRez's Improper Servicing of Plaintiff's Loan

40.    On July 18, 2020, White entered a mortgage loan with non-party LHM Financial Corporation, which was secured by a mortgage on the White's principal place of residence located at 2081 Parkridge Drive, Hurst, Texas 76054 ("White's Property").

41.    NewRez currently services the White's loan on behalf of LHM Financial Corporation of the White's loan, pursuant to a contractual agreement between NewRez and LHM Financial Corporation.

42.    Upon NewRez taking over servicing responsibilities of White's loan, she registered and arranged for payments to be made bi-monthly, being automatically withdrawn from her bank account through an ACH transfer to NewRez.

43.    In early January 2021, after the first bi-monthly ACH payment was made, White sent, via overnight delivery, a check in the amount of $4,205.64, from the Gary Sinise Foundation, representing two months of principal, interest, and escrow payments.

44.    On or about January 6, 2021, White contacted NewRez and confirmed its receipt of the $4,205.64 check on her behalf.  Additionally, White instructed NewRez to cancel immediately all future automatic bi-monthly ACH withdrawals from her bank account. The NewRez representative White spoke with confirmed her instructions and informed her no further ACH transfers would occur.

45.    On or about January 19, 2021, without White's consent, NewRez drafted $1,051.42. Upon discovering the ACH withdrawal, White contacted NewRez about the unauthorized withdrawal.  The representative White spoke with informed her that the money would be returned to her account that night.

46.     After several days of not seeing the credit in her bank account, on or about January 21, 2021, White contacted NewRez again.  White was informed that the credit had not been properly processed and that it needed to be reprocessed, however, it would take several days to correct.  White explained that NewRez's unauthorized withdrawal had caused her extreme financial stress at the height of the COVID-19 pandemic.  The NewRez representative responded that there was nothing that could be done.   Without option and under financial strain, White reported the unauthorized transfer to her bank.

47.     White's bank refunded the unauthorized transfer, however NewRez charged White an $30 NSF fee.  The NSF fee was completely improper, as NewRez had received the funds via check, and their withdrawal was unauthorized. Despite receiving full payment by check, in February and March of 2021, NewRez for no valid reason charged White two additional NSF fees.

48.     White disputed these NSF fees with NewRez.  NewRez agreed to waive one of the NSF fees, however, insisted that the other two were valid and would remain.  White, having made all monthly payments timely, made a complaint to the CFPB.

49.     Thereafter, in January 2022, White noticed the NSF fees remained on her account and saw additional late fees that were charged to her account.

50.     In examining her statements White saw that NewRez had failed to properly account for her November 2021 payment and completely failed to account her December 2021 payments despite NewRez having received the check on November 29, 2021 and cashed it on December 6, 2021.  As a result of this error, NewRez marked White's subsequent payments as late and began segregating her payments into suspense accounts and charging improper late fees on the account even though every payment was timely and complete in accordance with the note. White again complained to the CFPB.

51.     Month after month NewRez continued to improperly credit White's mortgage account, marking the payments as untimely, when they were not, and identifying her account as delinquent to the Credit Reporting Agencies ("CRAs"). In several instances payments were marked as not received and not credited to months later, yet the records reflect that these payments were timely sent, timely received, and cashed by NewRez.  Despite this, NewRez reported these payments as delinquent to the CRAs.

52.     In reviewing her credit reports, White discovered NewRez reported her account delinquent to the CRAs on at least nine (9) occasions.  Identifying her payments as being past due 30 to 60 days, when in fact they were not.

53.     Thereafter, on or about June 30, 2022, White sent a correspondence to NewRez at the address NewRez designated for borrowers to send communications pursuant to 12 C.F.R. §§ 1024.35(c) and 1024.36(b) (the "Designated Address"), captioned "Borrower's Notice of Error" (the "NOE") alleging that NewRez committed errors and misrepresentations in failing to timely and properly process her monthly mortgage payments, charging improper late and other fees, as well as identifying her account as delinquent and negatively reporting to the CRAs . *See*, a copy of the NOE, with tracking information evidence delivery of the NOE at the Designated Address, attached as, Exhibit B.

54.     NewRez received the NOE at the Designated Address on or about July 5, 2022. *See*, Exhibit B.

55.     NewRez did not provide a response to the White's June, 2023 NOE as required by RESPA and Regulation X.

56.     In accordance with the requirements of the FCRA, on July 2, 2022, White sent certified mail letters to the five major CRAs – Equifax Information Services LLC, Innovis, Equifax

Information Services LLC, Transunion LLC, and LexisNexis.  White's letters disputed the CRAs reports which were reporting a delinquency of her NewRez serviced mortgage.  This incorrect information was furnished to the CRAs by NewRez.

57.    The CRAs received White's dispute letters between July 9 and 13, 2022.

58.    Upon information and belief, the CRAs forwarded White's dispute to NewRez, as required under 15 U.S.C. § 1681(a)(2).

59.    In addition, on July 2, 2022, White sent, via certified mail, NewRez a copy of her dispute letter sent to the CRAs.  NewRez received a copy of this letter on July 19, 2022.  *See* a copy of the FCRA dispute letter with tracking evidence of delivery to NewRez, attached as Exhibit C.

60.    On or about July 21, 2022, White received correspondence with a report from Transunion which showed that after reinvestigation of her dispute, Transunion would continue to report the mortgage payments for March 2021, December 2021, and April 2022 as thirty (30) days past due.  Additionally, based upon information furnished by NewRez, Transunion was also reporting the payment for July 2022 as thirty (30) days past due.

61.    On or about July 21, 2022, Experian sent White a correspondence and report informing her that following a reinvestigation, Experian would continue to report the mortgage payments for March 2021, December 2021, and April 2022 as thirty (30) days past due.  Additionally, based upon information furnished by NewRez, Experian was also reporting the payment for July 2022 as thirty (30) days past due.

62.    On or about July 22, 2022, Innovis sent White a correspondence and report informing her that following a reinvestigation, Innovis would continue to report the mortgage payments for March 2021, December 2021, and April 2022 as thirty (30) days past due.

Additionally, based upon information furnished by NewRez, Innovis was also reporting the payment for July 2022 as thirty (30) days past due.

63.     On or about August 28, 2022, Equifax sent White a correspondence and report informing her that following a reinvestigation, Equifax would continue to report the mortgage payments for March 2021, December 2021, and April 2022 as thirty (30) days past due. Additionally, based upon information furnished by NewRez, Equifax was also reporting the payment for July 2022 as thirty (30) days past due. Moreover, Equifax reported that White's last payment on her mortgage was made on May 1, 2022 and that the first date of delinquency for the account was September 1, 2021.

64.     This reporting by the CRAs, as furnished by NewRez, is inaccurate for many reasons, including but not limited to:

     a.  The tradelines inaccurately report White as being late on her payments when in fact her payments were made and received timely, in accordance with the terms of White's Note[1]; and

     b.  The tradelines inaccurately report the payment history of White's account, reporting payments as not being made, when they were, and inaccurately reporting the amounts paid.

---

[1] By way of example, NewRez furnished information to the CRAs that White had not made a payment for November 2021, and was 30 days past due for December 2021.  However, those payments were in fact timely made and cashed by NewRez, yet NewRez completely failed to properly credit White's account of those payments, and charged her late fees, and negatively reported to the CRAs as well. White made the November 2021 payment on October 23, 2021, check #424, which was cashed by NewRez on October 28, 2021.  White made the December 2021 payment on November 29, 2021, check # 294, which was cashed by NewRez on December 6, 2021. Even in the face of being given the opportunity to correct its gross error, NewRez continued to furnish false information to the CRAs that it had made no errors in reporting.

65. NewRez, for its part, continued to improperly process and account for White's mortgage payments and continued to charge White impermissible late fees and continued to furnish inaccurate negative information to the CRAs.

66. As a result of repeated denials of credit and precipitous drops to her credit score, in early January, 2023 White, through counsel, sent renewed FCRA dispute letters to the CRAs, disputing the delinquency reporting being furnished by NewRez. In addition, White, also through counsel, sent copies of the FCRA dispute letters to NewRez.

67. On or about February 2, 2023, Experian sent White a correspondence and report informing her that following a reinvestigation, Experian would continue to report the mortgage payments for March 2021, December 2021, and April 2022 as thirty (30) days past due. The report included reporting June 2022 and September 2022 as thirty (30) days past due. The report had no data available for July 2022, which was previously being reported as thirty (30) days past due. Additionally, based upon information furnished by NewRez, Experian was also reporting the payments for October 2022, November 2022, December 2022 and February 2023 as sixty (60) days past due.

68. On or about February 20, 2023, Equifax sent White a correspondence and report informing her that Equifax    would continue to report the mortgage payments for March 2021, December 2021, and April 2022 as thirty (30) days past due. The report included reporting June 2022 and September 2022 as thirty (30) days past due. The report had no data available for July 2022, which was previously being reported as thirty (30) days past due. Additionally, based upon information furnished by NewRez, Equifax was also reporting the payments for October 2022, November 2022, and December 2022 as sixty (60) days past due. There was no data provided for payments in 2023.

69. This reporting by the CRAs, as furnished by NewRez, continue to be inaccurate for many reasons, including but not limited to:

   a. The tradelines inaccurately report White as being late on her payments when in fact her payments were made and received timely, in accordance with the terms of White's Note[2]; and

   b. The tradelines inaccurately report the payment history of White's account, reporting payments as not being made, when they were, and inaccurately reporting the amounts paid.

70. In addition to the FCRA dispute notices, and as NewRez did not provide White with a response to, and/or conduct an investigation of the items in White's June, 2022 NOE, on or about January 20, 2023, White, through counsel, and pursuant to 12 U.S.C. § 2605(e) and 12 C.F.R. 1024.35(a), sent NewRez a second notice of error (the "Second NOE"). NewRez received White's Second NOE on January 30, 2023. A copy of White's Second NOE; and a copy the United States Postal Service's delivery confirmation of same, are attached hereto as Exhibit D.

71. In the Second NOE, White put NewRez on notice of the following covered errors identified in White's June, 2022 NOE:

   a. Failure to properly process and record Borrower's monthly payments as timely since January 1, 2021.

---

[2] By way of example, NewRez furnished information to the CRAs that White had not made a payment for November 2021, and was 30 days past due for December 2021. However, those payments were in fact timely made and cashed by NewRez, yet NewRez completely failed to properly credit White's account of those payments, and charged her late fees, and negatively reported to the CRAs as well. White made the November 2021 payment on October 23, 2021, check #424, which was cashed by NewRez on October 28, 2021. White made the December 2021 payment on November 29, 2021, check # 294, which was cashed by NewRez on December 6, 2021. Even in the face of being given the opportunity to correct its gross error, NewRez continued to furnish false information to the CRAs that it had made no errors in reporting.

b.  Charging improper late fees to Borrower's account since January 1, 2021.

c.  Identifying Borrower's account as being delinquent and payments not received when they have been and were timely deposited by you.

d.  Improperly applying Borrower's monthly payments since January 1, 2021.

e.  Fraudulently reporting negative information to the credit bureaus about Borrower's account.

72.  In the Second NOE White also notified NewRez of its failure to acknowledge White's June, 2022 NOE, as required by 12 C.F.R. § 1024.35(d), and in violation of Regulation X. White also informed NewRez it had failed to respond to her June, 2022 NOE as required by 12 C.F.R. § 1024.35(e)(3)(i)(C), also in violation of Regulation X.

73.  In her Second NOE, White raised additional errors including:

a.  NewRez failed to provide escrow analysis or notice of increase due to escrow shortage warranting any increase in the monthly payment.

b.  NewRez failed to accept payments when made according to Your written requirements.

c.  NewRez failed credit payments as of the day they were received resulting in a charge to Borrower and or negative credit reporting.

d.  NewRez charged NSF fees to the account which were improper and caused by your errors. Borrower canceled the ACH on January 6th and January 7th of 2021. Despite Borrower's attempt to resolve these errors through the CFPB, you provided a written refusal to credit the NSF charges that were caused by your failure to stop the automatic ACH bi-monthly withdrawals.

74.     Like White's June, 2022 NOE, NewRez failed to acknowledge and respond to her Second      NOE in violation of RESPA and Regulation X.

75.     NewRez's accounting and processing of payments continues to be sloppy and imprecise.  Indeed, NewRez identified White's May 2023 payment as not having been made, and charged White another late fee, yet the records reflect that White made the payment on April 25, 2023, check #469, and NewRez cashed that check on May 5, 2023. Yet, NewRez did not credit that payment until June 14, 2023 and as stated above, charged White an improper late fee for its own negligence.

76.     For 17 months NewRez improperly identified White's account as delinquent and charged her additional $1,086.81 in improper late fees as well as threatening to foreclose on her home.

77.     As White's home is located in a non-judicial foreclosure state, and all avenues disputing NewRez's actions failed or were ignored, White had no option but to pay the fictitious delinquency, including the improper fees, to save her home from being taken from her.

78.     In June of 2023, White processed an early withdrawal from her IRA account to pay the over $5,000 in supposed delinquency White was being charged.  This early withdrawal subjected White to tax penalties, early withdrawal fees, and lost interest.

79.     Moreover, White's credit history remains inaccurate and her credit score has been affected, resulting in her being denied credit opportunities and increases.

80.     By its actions alleged above, NewRez has violated RESPA, 12 U.S.C. § 2605(e)(1)(A), and Regulation X, 12 C.F.R. § 1024.35(d) by failing to provide a written response acknowledging receipt of the White's repeated notice of errors - no later than five (5) days after receipt of those NOEs.

81.    Additionally, NewRez repeatedly violated Regulation X, 12 C.F.R. §
1024.35(e)(3)(i)(A)-(B) by failing to correct White's notice of errors, and thereafter providing
White with a written notification of the correction and other information; and/or by failing to
conduct a reasonable investigation of said notice of errors, and thereafter, providing White with a
written statement that it [NewRez] has determined that no error has occurred, along with other
statements mandated by 12 C.F.R. § 1024.35(e)(3)(i)(B).

82.    NewRez further violated RESPA, 12 U.S.C. § 2605(e)(2), 2605(k)(1)(C), and
Regulation X, 12 C.F.R. § 1024.35(e)(3)(A), by failing to provide the White with the information
and documentation requested, or an explanation why the information sought was unavailable, no
later than seven (7) days after receipt of the White's NOEs.

83.    NewRez also repeatedly violated the FCRA, 15 U.S.C. § 1681s-2(a), by furnishing
inaccurate information to the CRAs.  NewRez further violated the FCRA, 15 U.S.C. § 1681s-2(b),
by *inter alia,* failing to conduct an investigation of the disputed information; providing the CRAs
with the results of that investigation; and failing to correct inaccurate or incomplete information.

84.    NewRez has engaged in a pattern or practice of non-compliance with the
requirements of the mortgage servicer provisions of RESPA as set forth in 12 U.S.C. § 2605 and
the furnishing requirements of the FCRA. NewRez's willful ignoring of requests covered by
RESPA and Regulation X, as well as its failures to furnish accurate information to the CRAs,
affects not only White but thousands of borrows nationwide.

85.    Indeed , the CFPB has received over 4,647 complaints concerning NewRez's
improper loan servicing practices, over 400 of which involving similar complaints regarding

NewRez's failure to properly credit a mortgage payment, resulting in imposing impermissible late fees and furnishing inaccurate credit reporting.[3]

86.    White was harmed by NewRez's failure to respond to, and/or investigate her repeated NOEs.  This is evidenced by the fact that Plaintiff incurred costs relative to sending the NOEs - such as her time, postage, traveling, photocopying costs; and reasonable attorney's fees. Despite such costs, Plaintiff still did not receive the information to which she was legally entitled to - pursuant to RESPA and Regulation X.  Indeed, when NewRez "failed to do that which it was obligated to do [under RESPA and Regulation X]" in response to Plaintiff's NOEs, the time and expense associated with Plaintiff's submissions of her NOEs "metamorphosed into damages." *Marais v. Chase Home Fin., LLC*, 24 F.Supp.3d 712, 725 (S.D. Ohio 2014). In addition, White incurred costs of having to pay the improper and disputed amounts NewRez was assessing. As well as the penalties associated with having to take the money from her IRA.

87.    White also was harmed by NewRez's failures to abide by the FCRA. White suffered and continues to suffer due to NewRez's systemic failure to conduct reasonable investigations and/or reinvestigations, and repeated furnishing of inaccurate and/or incomplete consumer information to various CRAs.  Pursuant to 15 U.S.C. §§ 1681n and 1681o, NewRez willfully and/or negligently failed to comply with the requirements of 15 U.S.C. § 1681s-2(b) with respect to Plaintiff, as well as others similarly situated, and is liable for actual damages, costs, and attorneys' fees.  These damages include, but are not limited to, violation of their statutory rights, damage to their creditworthiness, impairment of their ability to rebuild and/or build their

---

[3] *See* https://www.consumerfinance.gov/data-research/consumer-complaints/search/?date_received_max=2023-08-24&date_received_min=2011-12-01&has_narrative=true&page=1&searchField=all&searchText=shellpoint&size=25&sort=created_date_desc&tab=List (last visited August 28, 2023).

creditworthiness, impairment of their ability to obtain credit on favorable terms and/or obtain credit whatsoever, as well as other injuries, including, without limitation, severe financial and emotional harm, which will be further evidenced through discovery.

## CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action individually and on behalf of all individuals similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following two defined classes:

**RESPA CLASS DEFINITION:**

All loan borrowers in the United States during the applicable statute of limitations period, (1) who have or had mortgage loans secured by residential real property obtained for personal, family, or household use, (2) whose mortgage loans are serviced by NewRez, (3) who submitted to NewRez a notice or request, in the form of a QWR, RFI, NOE, and/or other covered inquiry, and (4) to whom NewRez failed to provide an adequate or complete response relative to the information requested and/or perform an investigation into the errors asserted.

Excluded from the RESPA Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the RESPA Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

**FCRA CLASS DEFINITION:**

All loan borrowers in the United States during the applicable statute of limitations period, (1) who have or had mortgage loans secured by residential real property obtained for personal, family, or household use, (2) whose mortgage loans are serviced by NewRez, (3) who's payments were inaccurately identified by NewRez as past due thirty (30) or more days, (4) which such delinquency was furnished to the credit bureaus, (5) who were harmed, within the statutory limits prescribed by 15 U.S.C. § 1681p of the FCRA, due to NewRez's practice of failing to conduct a reasonable investigation and/or reinvestigation into consumer disputes received, and (6) who were also harmed by NewRez's practice of continuing to furnish inaccurate and/or incomplete information to the credit bureaus in violation of the FCRA.

Excluded from the FCRA Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the FCRA Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

89.     Plaintiff reserves the right to modify or amend the proposed class definitions before the Court determines whether certification is appropriate.

90.     Under Fed. R. Civ. P. 23(a)(1), the proposed classes are made up of at least 40 persons, the joinder of whom are impracticable except by means of a class action. The disposition of the claims in a class action will benefit both the parties and the Court. The exact number of class members can be determined through discovery and review of NewRez's business records.

91.     The proposed class is ascertainable because it is defined by reference to objective criteria. In addition, and upon information and belief, the names and addresses of all members of the proposed class can be identified in business records maintained by NewRez.

92.     In conformance with Fed. R. Civ. P. 23(a)(2), all Class Members' claims (including Plaintiff's) are unified in that they arise from the same improper charging, accounting, and collection practices arising out of materially identical circumstances. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the proposed class.

93.     Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a member of the Classes. Her claims are typical of all other Class Members. All Class Members' claims are unified, as all were victims of the same collection and charging practices.

94. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff will adequately represent the class because she has interests in common with the proposed Class Members and she has retained attorneys who are experienced in class action litigation.

95. Pursuant to Fed. R. Civ. P. 23(b)(3), there is a well-defined community of interest in the questions of law and fact involving and affecting the class to be represented by Plaintiff. Common questions of law and/or fact predominate over any questions affecting only individual members of the class. Common questions include, but are not limited to, the following:

   a. Whether NewRez failed to provide substantive responses to Plaintiff's and Class Members' inquiries in violation of RESPA and Regulation X;

   b. Whether NewRez properly responded to the notices of error sent on behalf of the RESPA Class;

   c. Whether Plaintiff and Class Members are entitled to recover statutory damages under RESPA and Regulation X and the amounts thereof;

   d. Whether NewRez willfully violated the FCRA by failing to conduct a reasonable investigation and/or reinvestigation into the disputes submitted by consumers to CRAs, and received by NewRez, as to the accuracy and/or completeness of the consumer information being provided by NewRez to the CRAs;

   e. Whether NewRez willfully violated the FCRA by continuing to furnish inaccurate and/or incomplete information or Inaccuracies about Plaintiff and Class Members to one or more CRAs;

   f. Whether NewRez negligently violated the FCRA by failing to conduct a reasonable investigation and/or reinvestigation into the disputes submitted by consumers to CRAs, and received by NewRez, as to the accuracy and/or completeness of the

consumer information being provided by NewRez to the CRAs;

g.  Whether NewRez negligently violated the FCRA by continuing to furnish inaccurate and/or incomplete information or Inaccuracies about Plaintiff and Class Members to one or more CRAs;

h.  Whether Plaintiffs and Class Members suffered actual damages, and the measure and amount of those damages;

i.  Whether Plaintiffs and Class Members are entitled to recover statutory damages; and

j.  The proper measure of disgorgement and/or actual and/or punitive damages and/or restitution, as well as other recovery to the class, including fees and costs.

96.  Further, the prosecution of separate actions by individual members of the class would create a risk of:

a.  Inconsistent or varying adjudications concerning individual members of the class that would establish incompatible standards of conduct for the defendant opposing the class; and

b.  Adjudication with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of other members not parties to such adjudications, and/or substantially impair or impede the ability of other non-party class members to protect such individual interests.

97.  The class action method is appropriate for the fair and efficient prosecution of this action.

98.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each Class Member's claims are small

relative to the complexity of the litigation, and due to the financial resources of NewRez, no member of the Class could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and NewRez's misconduct will proceed without remedy.

99.    Even if members of the Class could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

100.    Certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because it is clear that declaratory and injunctive relief is appropriate respecting the Classes as a whole.

## COUNT I

**VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT AND REGULATION X, 12 U.S.C. § 2605(e), 12 U.S.C. § 2605(k), and 12 C.F.R. § 1024.35(e)**
**(On behalf of Plaintiff and the RESPA Class)**

101.    Plaintiff repeats and realleges paragraphs 1 through 91 as if fully stated herein.

102.    Plaintiff brings this claim individually and on behalf of the members of the RESPA Class.

103.    Plaintiff and the Members of the RESPA Class, in conjunction with their loans serviced by NewRez submitted notice of errors (NOEs) to NewRez in which it received at the address that it has designated to receive such "qualified written requests" (QWRs).

26

104.    "A servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred." 12 C.F.R. § 1024.35(a)

105.    Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. § 1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower." Supplement I to Part 1024.

106.    A servicer must respond to a notice of error by either:

(A)    Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

(B)    Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i); *see also* 12 U.S.C. § 2605(e)(2)(B).

107.    A servicer must respond to a notice of error in compliance with 12 C.F.R. § 1024.35(e)(1):

(A)    Prior to the date of a foreclosure sale or within 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the notice of error, whichever is earlier, for errors asserted under paragraphs (b)(9) and (10) of this section.

> (B) For all other asserted errors, not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives the applicable notice of error.

12 .F.R. § 1024.35(e)(3)(i); *see also* 12 U.S.C. § 2605(e)(2).

108.    "A servicer of a federally related mortgage shall not...fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

109.    A servicer of a federally related mortgage shall not "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

110.    Plaintiff and members of the RESPA Class sent notices of error (the "NOEs) to NewRez at the Designated Address alleging that NewRez committed covered errors in the servicing of their mortgage loans.

111.    NewRez failed to adequately respond to the NOEs in violation of 12 C.F.R. § 1024.35(e) as NewRez failed to admit and correct the alleged errors or otherwise failed to perform a reasonable investigation into said errors, if NewRez responded at all.

112.    NewRez's failures to perform a reasonable investigation into and otherwise properly respond to the errors alleged through NOEs constitute violations of 12 C.F.R. § 1024.35(e) and 12 U.S.C. §§ 2605(e) and (k) and has caused Plaintiff and RESPA Class Members to suffer actual damages as detailed, *supra*.

113.    NewRez's actions are part of a pattern and practice of behavior in conscious disregard for Plaintiff's and RESPA Class Members' rights and NewRez's obligations under RESPA and Regulation X.

114.    NewRez's conduct as plead, *supra*, shows a conscious disregard for Plaintiff's and RESPA Class Members' rights and NewRez's obligations under RESPA and Regulation X.

115.    As a result of NewRez's actions, NewRez is liable to Plaintiff and RESPA Class Members for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

## COUNT II
### WILLFUL NONCOMPLIANCE WITH THE
### FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681n
### (On behalf of Plaintiff and the FCRA Class)

116.    Plaintiff repeats and realleges paragraphs 1 through 91 as if fully stated herein.

117.    Plaintiff brings this claim individually and on behalf of the members of the FCRA Class.

118.    NewRez is, was, and at all times material to this action, a "furnisher" of consumer credit information pursuant to 15 U.S.C. § 1681s-2.

119.    NewRez received Plaintiff's and FCRA Class Members notice of dispute of the reporting for their credit accounts, or the "Disputes," from the CRAs, including, Experian, Equifax, Trans Union, Innovis, and LexisNexis. Additionally, NewRez received a copy of the Disputes directly from Plaintiff and the Members of the FCRA Class.

120.    NewRez was provided notice of the Disputes, concerning the inaccuracies furnished by NewRez to various CRAs pertaining to Plaintiff and the FCRA Class Members, with ample time and opportunity to reasonably investigate, reinvestigate, and cure, but failed to do so.

121.    NewRez is liable under 15 U.S.C. § 1681n by violating 15 U.S.C. § 1681s-2(b) by:

   a.  Willfully failing to conduct a reasonable investigation and/or reinvestigation into the Disputes, including, the specific information contained in the Disputes;

b.  Willfully failing to adequately report the results of its investigation and/or reinvestigation to the CRAs;

c.  Willfully failing to report complete and accurate consumer information pertaining to Plaintiff, and members of the FCRA Class, to the CRAs;

d.  Willfully failing to accurately and/or completely report to the CRAs that NewRez's own cashering and accounting failures were at fault, and that Plaintiff's and the FCRA Class Members' payments were not past due;

e.  Willfully and maliciously failing to comply with NewRez's duty, as a furnisher of information and consumer data, to investigate and/or reinvestigate disputes submitted by consumers to CRAs and received by NewRez, as to the accuracy and/or completeness of the consumer information being provided by NewRez to CRAs, and continuing to furnish inaccurate and/or incomplete information about consumers;

f.  Willfully and repeatedly furnishing inaccurate and/or incomplete information pertaining to Plaintiff and members of the FCRA Class to various CRAs despite determining that the information being furnished is inaccurate and/or incomplete; and

g.  Maintaining and engaging in a systemic pattern and practice of willful noncompliance with NewRez's duties as prescribed by 15 U.S.C. § 168ls-2(b) of the FCRA.

122.    As a result of NewRez's willful noncompliance with the FCRA in violation of NewRez's duty, Plaintiff and members of the FCRA Class have suffered concrete and particularized injury, including, without limitation, the violation of their statutory rights, severe

damage to their personal and consumer reputations, damage to their creditworthiness, impairment of their ability to rebuild and/or build their creditworthiness, impairment of their ability to obtain credit on favorable terms and/or obtain credit whatsoever, as well as other injuries, including, without limitation, severe financial and emotional harm, which will be further evidenced through discovery.

123.    NewRez's conduct was willful, rendering NewRez liable for actual damages, costs, and attorney's fees under 15 U.S.C. § 1681n of the FCRA.

## COUNT III

### NEGLIGENT NONCOMPLIANCE WITH THE
### FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681o
### (On behalf of Plaintiff and the FCRA Class)

124.    Plaintiff repeats and realleges paragraphs 1 through 91 as if fully stated herein.

125.    Plaintiff brings this claim individually and on behalf of the members of the FCRA Class.

126.    NewRez is, was, and at all times material to this action, a "furnisher" of consumer credit information pursuant to 15 U.S.C. § 1681s-2.

127.    NewRez received Plaintiff's and FCRA Class Members notice of dispute of the reporting for their credit accounts, or the "Disputes," from the CRAs, including, Experian, Equifax, Trans Union, Innovis, and LexisNexis. Additionally, NewRez received a copy of the Disputes directly from Plaintiff and the Members of the FCRA Class.

128.    NewRez was provided notice of the Disputes, concerning the inaccuracies furnished by NewRez to various CRAs pertaining to Plaintiff and the FCRA Class Members, with ample time and opportunity to reasonably investigate, reinvestigate, and cure, but failed to do so.

129.    NewRez is liable under 15 U.S.C. § 16810 by violating 15 U.S.C. § 1681s-2(b) by:

a. Negligently failing to conduct a reasonable investigation or reinvestigation into the Disputes, including, the specific information contained in the Disputes;

b. Negligently failing to adequately report the results of its investigation and/or reinvestigation to the CRAs;

c. Negligently failing to report complete and accurate consumer information pertaining to Plaintiff, and Members of the FCRA Class, to the CRAs;

d. Negligently failing to accurately and/or completely report to the CRAs that NewRez's own cashiering and accounting failures were at fault, and that Plaintiff's and the FCRA Class Members' payments were not past due;

e. Negligently breaching NewRez's duty, as a furnisher of information and consumer data, to investigate and/or reinvestigate disputes submitted by consumers to CRAs and received by NewRez, as to the accuracy and/or completeness of the consumer information being provided by NewRez to CRAs, and continuing to furnish inaccurate and/or incomplete information about consumers;

f. Repeatedly and negligently furnishing inaccurate and/or incomplete information pertaining to Plaintiff and Members of the FCRA Class to one or more CRAs despite determining that the information being furnished is inaccurate and/or incomplete; and

g. Maintaining and engaging in a systemic pattern and practice of negligent noncompliance with NewRez's duties as prescribed by 15 U.S.C. § 168ls-2(b) of the FCRA.

130. As a result of NewRez's negligent noncompliance with the FCRA and breach of NewRe    z's duties as a furnisher of consumer information, Plaintiff and Members of the FCRA

Class have suffered concrete and particularized injury, including, without limitation, the violation of their statutory rights, severe damage to their personal and consumer reputations, damage to their creditworthiness, impairment of their ability to rebuild and/or build their creditworthiness, impairment of their ability to obtain credit on favorable terms and/or obtain credit whatsoever, as well as other injuries, including, without limitation, severe financial and emotional harm, which will be further evidenced through discovery.

131.    NewRez's conduct was negligent, rendering NewRez liable for actual damages, costs, and attorney's fees pursuant to 15 U.S.C. § 168ls-2(b) of the FCRA.

## JURY DEMAND

132.    Plaintiff respectfully requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, on behalf of herself and the Classes, respectfully requests this Court to award against NewRez in favor of Plaintiff and the Classes all of the following:

a.    Certifying Plaintiff's claims for class treatment under Federal Rules of Civil Procedure 23(a) and (b)(3), appointing Plaintiff as Class Representative, and appointing Plaintiff's attorneys as counsel for the Classes;

b.    For an order awarding compensatory damages on behalf of Plaintiff and the Classes in an amount to be proven at trial;

c.    For judgment for Plaintiff and the Classes on their claims in an amount to be proven at trial, for compensatory damages caused by Defendant's unfair or deceptive practices, for exemplary damages to each Class member for each violation;

d.  For an order enjoining Defendant from continuing its unfair, unlawful, and/or decepetive practices, and any other injunctive relief as may appear necessary and appropriate;

e.  For judgment for Plaintiff and the Classes on their federal and state law claims, in an amount to be proven at trial;

f.   For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g.  For an order awarding Plaintiff and the Classes their attorneys' fees and costs; and,

h.  Any other relief for Plaintiff and the Class the Court deems just and proper.

Dated: September 14, 2023.

By: */s/ Patrick Howard*_____
Patrick Howard, Esq. (Atty ID 88572)
**SALTZ MONGELUZZI &**
**BENDESKY, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
T: (215) 575-3895
phoward@smbb.com

Scott David Hirsch, Esq. (*pro hac vice forthcoming*)
**SCOTT HIRSCH LAW GROUP**
Fla. Bar No. 50833
6810 N. State Road 7
Coconut Creek, FL 33073
Tel: (561) 569-7062
Email: scott@scotthirschlawgroup.com

David A. Goodwin, Esq. (*pro hac vice forthcoming*)
**GUSTAFSON GLUEK**
120 South 6th Street, Ste. 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
dgoodwin@gustafsongluek.com

Jessica L. Kerr, Esq. (*pro hac vice forthcoming*)
**THE ADVOCACY GROUP**
100 S. Biscayne Blvd, Suite 300
Miami, FL 33131
Telephone: (954) 282-1858
*jkerr@advocacypa.com*

*Attorneys for Plaintiff Misty White and the members of the putative classes*