IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MISTY HERNANDEZ, f/k/a MISTY WHITE,**<br>      **Plaintiff,**<br><br>    v.<br><br>**NEWREZ, LLC, d/b/a SHELLPOINT MORTGAGE SERVICING,**<br>      **Defendant.** | **CIVIL ACTION**<br><br><br><br>**NO. 23-3569** |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Misty Hernandez brings individual and putative class claims alleging Defendant Shellpoint Mortgage Servicing violated the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 (RESPA), and the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 (FCRA). Shellpoint has moved to strike Plaintiff's class allegations pursuant to Fed. R. Civ. P. 12(f), 23(c)(1)(A), and 23(d)(1)(D). For the reasons that follow, Shellpoint's Motion will be denied.

**I. BACKGROUND**

Hernandez alleges that Shellpoint, a loan servicer, engaged in a pattern and practice of failing to properly process her and others' home-mortgage payments. She claims that these failures led to "negligent or improper credit reporting" and the assessment of "prohibited or improper fees."

RESPA was enacted to ensure "that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601. Among other things, RESPA requires loan servicers to respond to certain consumer requests for information or correction:

Qualified Written Requests (QWR), Requests for Information (RFI), and Notices of Error (NOE).  In 2010, The Consumer Financial Protection Bureau issued "Regulation X," which clarified and expanded the category of requests to which mortgage servicers must respond. FCRA requires any company that furnishes consumer credit information to credit-reporting agencies to take certain steps when a consumer believes the company has furnished inaccurate information.

Here, Hernandez alleges that Shellpoint violated both RESPA and FCRA with respect to her and a class of similarly situated borrowers.

## II. LEGAL STANDARD

Rule 12(f) governs motions to strike.  It provides that the Court, "on its own" or "on motion made by a party," may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  And under Rule 23(d)(1)(D), the Court may "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly."

## III. DISCUSSION

### A. High Bar to Strike Class Allegations

As an initial matter:  The parties have not completed class discovery and Hernandez has not yet filed a motion for class certification.  Shellpoint argues that it is nonetheless appropriate to strike Hernandez' class allegations at this stage.  For support it cites *Donelson v. Ameriprise Financial Services, Inc.*, in which the Eighth Circuit held that class allegations may be stricken at the pleading stage if the allegations are "unsupportable" and "bring impertinent material into the pleading," and permitting them to remain "would prejudice the defendant by requiring the

mounting of a defense against claims that ultimately cannot be sustained." 999 F.3d 1080, 1092 (8th Cir. 2021) (quotations omitted).

Motions to strike of all sorts are "disfavored" and "usually denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." *Woodard v. FedEx Freight E., Inc.*, 250 F.R.D. 178, 181-82 (M.D. Pa. 2008). District courts are "generally reluctant" to strike class allegations before discovery or certification unless "where the complaint and any affidavits clearly demonstrate that the plaintiff cannot meet the requirements for a class action." *Id.* at 182. In *Woodard*, for instance, the court granted FedEx's motion to strike Woodard's class allegations because it found it lacked jurisdiction over them.

Because the bar for granting a motion to strike class allegations before class certification is so high, "district courts within the Third Circuit typically conclude that motions to strike class action allegations filed before plaintiffs move for class certification are premature." *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 284 F.R.D. 238, 244 (E.D. Pa. 2012). To make a final class-certification decision under Rule 23, "a district court must conduct a rigorous analysis, [in which it] may delve beyond the pleadings to determine whether the requirements for class certification are satisfied," and that "rigorous analysis" typically requires "[d]iscovery and full briefing on the merits of class certification." *Id.* at 244-45 (quotations omitted). As a result, "[i]t is only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23, that a motion to strike class allegations should be granted." *Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp.3d 610, 615 (E.D. Pa. 2015). *See also Richardson v. Bledsoe*, 829 F.3d 273, 288-89 (3d Cir. 2016) ("a court should typically

await the development of a factual record before determining whether the case should move forward on a representative basis.").[1]

Shellpoint argues that Hernandez' class allegations should be stricken, even this early, because they are impermissible as pleaded and no amendment could save them.  It raises two contentions: first, that Hernandez' classes as defined are improper fail-safe classes; second, that Hernandez' classes require detailed individualized inquiries to determine membership and therefore cannot satisfy Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Both contentions will be assessed below against the high standard a motion to strike must meet.

### B. Failsafe Classes

Shellpoint first argues that Hernandez' class allegations should be stricken on the grounds that they are impermissible fail-safe classes.  A fail-safe class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 167 (3d Cir. 2015), as amended (Apr. 28, 2015).  The Third Circuit "ha[s] never expressly held that fail-safe classes are impermissible," though "other circuits, such

---

[1] There are good policy reasons to maintain trigger discipline with regard to class allegations.  "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).  And

> The most compelling [use of a class action] occurs when someone inflicts a small harm on each member of a large group of people.  In such a case, any one victim would have to spend more money to hire a lawyer than he could recover by winning the lawsuit, so he would not sue.  The class action enables the claims of all the individual victims to be aggregated, thereby spreading the lawsuit's costs among all class members and creating a potential recovery that is large enough to make the suit economically viable.  Although each individual who is harmed wins only a small amount, the public benefit is substantial.  The costs of the large public harm are borne by the person or firm responsible for it, and incentives to commit future transgressions are removed.  In this way, the class action provides for the private enforcement of laws that are aimed at protecting the public.

John Bronsteen & Owen Fiss, *The Class Action Rule*, 78 Notre Dame L. Rev. 1419, 1419 (2003).

4

as the Seventh Circuit, have held that fail-safe classes are improper because they enable one-way intervention." *Wolff v. Aetna Life Ins. Co.*, 77 F.4th 164, 170 n.4 (3d Cir. 2023) (citing *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). In *Messner*, the Seventh Circuit explained that a member of a fail-safe class "either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825.

Another district court neatly explained the problems with fail-safe classes. A fail-safe class definition "is essentially circular" because "[i]t defines its members on the presumption that such members have viable claims against the defendant," and therefore it "assumes what it ostensibly seeks to prove." *Hurt v. Shelby Cnty. Bd. of Educ.*, 2014 WL 4269113, at *8 (N.D. Ala. Aug. 21, 2014). Fail-safe classes also introduce "practical complications":

> [T]hey permit plaintiffs to circumvent *res judicata* and basically rig the certification process so that they cannot lose. That is, either the class members win or, by virtue of losing, they are not in the class and, therefore, not bound by the judgment. A fail-safe class thus creates a 'heads I win, tails you lose' situation, where class members either receive a favorable judgment or are defined out of the class. This scenario is patently unfair to the defendant. Finally—and most obviously—a fail[-]safe class is unmanageable because the members of the class could only be known after a determination of liability. In short, fail[-]safe classes preclude the court from ascertaining the contours of the class, which is the *sine qua non* of Rule 23 certification.

*Id.* (citations removed).

Shellpoint argues that Hernandez' proposed classes are improper fail-safe classes. Both classes will be analyzed below.

### i. Hernandez' proposed RESPA class

Hernandez' proposed RESPA class is defined as follows:

> All loan borrowers in the United States during the applicable statute of limitations period, (1) who have or had mortgage loans secured by residential real property obtained for personal, family, or household use, (2) whose mortgage loans are serviced by [Shellpoint], (3) who submitted to [Shellpoint] a notice or request, in the form of a QWR, RFI, NOE, and/or other covered inquiry, and (4) to whom

> [Shellpoint] ***failed to provide an adequate or complete response relative to the information requested*** and/or perform an investigation into the errors asserted.[2]

(emphasis added).

Shellpoint contends that whether it "failed to provide an adequate or complete response" is "a central element of a RESPA claim" and therefore the determination of whether a borrower is in the proposed RESPA class is "inextricably bound with the question of [RESPA] liability." Hernandez responds that the proposed class definition does not raise the liability question; instead, class membership is determined by "a series of objective, factual"—that is, not *legal*— "questions." Hernandez states (without explanation or citation) that "should a fact[-]finder determine that [Shellpoint] acted properly, all class members would be precluded from filing subsequent claims, ensuring *res judicata*."

But Hernandez does not respond to Shellpoint's specific allegation that Hernandez' proposed RESPA class definition is "inextricably bound" to Shellpoint's RESPA liability by Hernandez' proposed inclusion of people "to whom [Shellpoint] failed to provide an adequate or complete response relative to the information requested." It is difficult to imagine what makes a response "adequate" or "complete" here except by reference to RESPA. Indeed, Hernandez' RESPA allegations focus directly on the adequacy and completeness of Shellpoint's responses to communications from borrowers: She alleges that class plaintiffs "submitted notice[s] of error[] (NOEs)" to Shellpoint that Shellpoint "received at the address that it has designated to receive such 'qualified written requests' (QWRs)"; that RESPA requires a servicer to respond to any NOE by either correcting the errors and informing the borrower or by conducting a "reasonable investigation" and informing the borrower that it found no errors; and, critically, that Shellpoint

---

[2] The proposed RESPA class definition also lists several exclusions for conflict-of-interest avoidance.

6

"*failed to adequately respond to the NOEs in violation of*" Regulation X (emphasis added).  As written, Hernandez' proposed RESPA class definition does directly condition membership on Shellpoint's liability under RESPA.[3]

### ii. Hernandez' Proposed FCRA Class

Hernandez' proposed FCRA class is defined as follows:

> All loan borrowers in the United States during the applicable statute of limitations period, (1) who have or had mortgage loans secured by residential real property obtained for personal, family, or household use, (2) whose mortgage loans are serviced by [Shellpoint], (3) who[se] payments were inaccurately identified by [Shellpoint] as past due thirty (30) or more days, (4) which such delinquency was furnished to the credit bureaus, (5) who were harmed, within the statutory limits prescribed by 15 U.S.C. § 1681p of the FCRA, due to [Shellpoint]'s practice of failing to conduct a reasonable investigation and/or reinvestigation into consumer disputes received, and (6) who were also harmed by [Shellpoint]'s practice of continuing to furnish inaccurate and/or incomplete information to the credit bureaus in violation of the FCRA.[4]

Shellpoint argues that Hernandez' proposed definition conditions membership on a determination that Shellpoint is liable under FCRA.  Hernandez responds that her proposed FCRA class does not predicate membership on Shellpoint's FCRA liability but rather simply directs the Court to "ask a series of objective, factual questions."  For support, Hernandez cites *Grubb v. Green Tree Servicing, LLC*, 2017 WL 3191521 (D.N.J. July 27, 2017) and *Arcieri v. Suntuity Solar LLC*, No. 20-16292, ECF No. 15 (D.N.J. Sept. 28, 2021).  The defendants in those cases argued that the plaintiffs' proposed classes were impermissible fail-safe classes.  Both defendants' arguments failed.  In *Grubb* the court explained that district courts "refrain[] from

---

[3] To the extent Hernandez intended the adequacy and completeness of Shellpoint's responses to be determined with reference to some other standard besides RESPA and Regulation X, it is unclear from the text of the proposed definition what that might be.

[4] The proposed FCRA class definition also lists several exclusions for conflict-of-interest avoidance.

7

certifying a proposed class if the definition of the class employs conclusory language identifying class membership in terms of the ultimate merits question of the defendant's liability." *Grubb*, 2017 WL 3191521, at *14.  In that case, though, the proposed class definition did not tie membership to a violation of any statute.[5]  Likewise, in *Arcieri*, the court explained that because the proposed class criteria did not condition membership on statutory liability, "[t]he mere fact that these criteria may correlate with success on the merits does not mean that they amount to a fail-safe class."[6]

---

[5] The proposed *Grubb* class included:

> All New Jersey consumers who were sent initial letters and/or notices from GREEN TREE concerning a debt owed to Fannie Mae and/or Bank of America, between July 24, 2013 and July 24, 2014, which was in default at the time the debt was transferred to Green Tree, where such letter/notice stated the amount of the debt but did not provide such information regarding how the amount of the debt was calculated.
>
> and/or
>
> All New Jersey consumers who were sent initial letters and/or notices from GREEN TREE concerning a debt owed to Fannie Mae and/or Bank of America, between July 24, 2013 and July 24, 2014, which was in default at the time the debt was transferred to Green Tree, where such letter/notice stated the amount of the debt but did not provide such information regarding how the amount of the debt was calculated, and was sent an additional letter/notice within 30 days of the initial letter/notice which provided 'Monthly Payment Information', and/or the 'Principal Balance' and/or the 'Escrow Balance.'

*Grubb v. Green Tree Servicing, LLC*, 2017 WL 3191521, at *15 (D.N.J. July 27, 2017).

[6] The proposed *Arcieri* classes included:

> Pre-recorded No Consent Class: All persons in the United States who from four years prior to the filing of this action through class certification (1) Defendant (or an agent acting on behalf of Defendant) called (2) using a pre-recorded voice message, (3) for substantially the same reason Defendant called Plaintiff, and (4) for whom the Defendant claims it obtained the person's number the same way it obtained Plaintiff's number.
>
> Do Not Call Registry Class: All persons in the United States who from four years prior to the filing of this action through class certification (1) Defendant (or an agent acting on behalf of the Defendant) called more than one time, (2) within any 12-month period, (3) where the person's telephone number had been listed on the National Do Not Call Registry for at least thirty days, (4) for substantially the same reason Defendant called Plaintiff, and (5) for whom the Defendant claims it obtained the person's number the same way it obtained Plaintiff's number.

*Arcieri v. Suntuity Solar LLC*, No. 20-16292, ECF No. 15 at 4 (D.N.J. Sept. 28, 2021).

Here, by contrast, Hernandez' proposed FCRA does tie membership directly to Shellpoint's FCRA liability. Membership in the proposed class includes those "who were harmed, within the statutory limits prescribed by 15 U.S.C. § 1681p of the FCRA," which provides for federal-court jurisdiction over FCRA actions and establishes time limitations. And even more directly, members of Hernandez' proposed FCRA class must have been "harmed by [Shellpoint]'s practice of continuing to furnish inaccurate and/or incomplete information to the credit bureaus *in violation of the FCRA*" (emphasis added). Like the proposed RESPA class, the proposed FCRA class conditions membership on Shellpoint's alleged "violation of the FCRA."

### iii. Striking Not Justified

Still, that the proposed classes as currently written tie membership to Shellpoint's statutory liability to some extent does not require that the Court strike them. Before a request for class certification is made, "[d]iscovery is necessary for the district court to conduct the rigorous analysis it is tasked with," and "more than speculation and supposition is needed" to determine whether a class action is indeed appropriate. *Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 95 (3d Cir. 2011), opinion reinstated in part, 2012 WL 2052685 (3d Cir. Apr. 17, 2012). Determining the "precise nature of the class claims" requires a "robust record." *Id.* Here that record has not yet been developed, and the Court cannot perform the rigorous analysis required to determine the extent to which Hernandez' class claims may have to be amended to solve any fail-safe problem. Therefore, Hernandez' class claims will not be stricken for conditioning membership on Shellpoint's liability.

### C. Individualized Determinations

Shellpoint next argues that even if Hernandez' class definitions could be amended to fix the fail-safe problem, the class allegations should still be stricken because they cannot possibly

9

satisfy Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members."

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018). "At the class certification stage, the predominance requirement is met only if the district court is convinced that the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 127-28 (3d Cir. 2018) (quotations removed). And "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001), as amended (Oct. 16, 2001).

As to Hernandez' proposed RESPA class, Shellpoint argues that individual questions predominate over class questions. In particular, Shellpoint contends that the inclusion of class members who "submitted to [Shellpoint] a notice or request, in the form of a QWR, RFI, NOE, and/or other covered inquiry" requires first determining whether each communication allegedly sent by each alleged class member actually qualifies as a QWR, RFI, or NOE, and second determining whether Shellpoint's response with respect to each alleged member was sufficient. These individual questions, Shellpoint argues, "will predominate over any alleged common questions of fact or law." Hernandez responds that the "heart" of the claims is "whether [Shellpoint] failed to timely and accurately process" mortgage payments, "provide [her] with the information . . . requested," and "perform a reasonable investigation regarding the . . . errors." These questions, she argues, are "common to the class, central to the validity of each member's

claim, and predomina[nt]." In fact, she contends, "Defendant's own records would provide the information needed to confirm or deny these claims for each potential class member."

As to Hernandez' proposed FCRA class, Shellpoint likewise argues that the basics of a FCRA claim raise individual questions that will predominate over any class questions. FCRA, Shellpoint argues, requires companies that furnish credit data to conduct "reasonable" investigations when consumers properly notify them—and what constitutes a "reasonable" inquiry, Shellpoint contends, is inherently "fact-specific" and "necessarily require[s] individualized inquiries." Hernandez responds that the inquiries required by her FCRA class definition are not individual but collective: whether Shellpoint "fail[ed] to conduct and report the results of reasonable investigation" and "fail[ed] to maintain a practice of compliance with its duties to [e]nsure that the information . . . [was] complete and accurate."

It does appear that Hernandez' proposed classes, as currently written, would require some individualized inquiry. To at least some extent, the circumstances of each putative class member's documentation submission and Shellpoint's response would need to be ascertained. Still, predominance does not prohibit all individualized inquiry: "[T]he presence of individual questions does not *per se* rule out a finding of predominance. . . . If issues common to the class overwhelm individual issues, predominance should be satisfied." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3d Cir. 2015) (citing *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455 (2013); *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998)). And "when a court considers predominance, it may have to venture into the territory of a claim's merits and evaluate the nature of the evidence. In most cases, some level of discovery is essential to such an evaluation." *Landsman & Funk PC*, 640 F.3d at 93. The

existence of these individual questions does not require the striking of Hernandez' claims, especially at this early stage before discovery.

Shellpoint seems to contend that RESPA and FCRA class actions are *per se* impermissible: It argues that "the very nature of the classes [Hernandez] hopes to represent—a RESPA and a FCRA class—require individualized inquiry preventing class treatment." But the question is not whether the proposed classes require *any* individualized inquiry. By its nature a class is composed of members whose individual situations are likely to differ slightly. The question is just whether the collective questions *predominate* over the individual ones, and discovery is required to make this determination.

## IV.     CONCLUSION

As the Seventh Circuit explained in *Messner*, "[d]efining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science," and "[e]ither problem can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." 669 F.3d at 825. Here, Hernandez' class definitions are not so clearly deficient that no class could ever be certified, and therefore Shellpoint does not meet the high standard for a pre-certification motion to strike. Other remedies to any deficiencies in the class definitions, including amendment and dividing putative classes into sub-classes, remain available. *Landsman & Funk PC*, 640 F.3d at 95. Accordingly, Shellpoint's Motion will be denied.

An appropriate order follows.

**BY THE COURT:**

*/s/ Wendy Beetlestone*

**WENDY BEETLESTONE, J.**